IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


TAMMY A. SLATTEN                    )
                                   )          No. 2:05-0048
v.                                 )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security[1] )


To:     Honorable John T. Nixon, Senior United States District Judge


## REPORT AND RECOMMENDATION


The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security, denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff had the residential functional capacity to perform light work is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 10) should be denied.


## I.  INTRODUCTION

The plaintiff filed an application for DIB on July 17, 2001, after a car wreck on November 4, 2000.  She alleged disability on the basis of back pain, with an onset date of May 14, 2001, when

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) fo the Federal Rules of Civil Procedure.

she could no longer work at her previous jobs. (Tr. 66, 76.) The plaintiff's claim was denied initially and upon reconsideration. (Tr. 41-52.) In her request for reconsideration, she also asserted her depression as a disabling condition. (Tr. 104.) A hearing was held on May 26, 2004, before Administrative Law Judge ("ALJ") Robert Haynes (Tr. 443-477). The ALJ issued an unfavorable decision on December 15, 2004. (Tr. 27-31.) The plaintiff sought review by the Appeals Council, which denied her request for review on March 24, 2005 (Tr. 5-8), and the ALJ's decision became the final decision of the Commissioner.

The plaintiff raises the following assertions of error:

1. The ALJ either failed to consider, or misapplied, the factors set forth in CFR § 404.1527 when he evaluated the medical opinion of examining physician, Dr. Christopher A. Edwards;

2. The ALJ failed to follow the direction in Social Security Ruling (SSR) 96.5p by not seeking clarification of a medical opinion, and failed to provide an appropriate explanation for rejecting Dr. Edwards' opinion as required by that ruling;

3. The ALJ either failed to consider, or misapplied the factors set forth in CFR § 404.1569a regarding the plaintiff's exertional and nonexertional limitations;

4. The ALJ either failed to consider or misapplied the factors required under CFR § 404.1529 and SSR 96-7p in making the determination that the plaintiff's allegations regarding her limitations were not totally credible;

5. The ALJ did not rely on accurate hypothetical questions in determining that the plaintiff was not disabled; and

6. The administrative record does not contain substantial evidence to support the ALJ's conclusion that the plaintiff is not disabled.

Docket Entry No. 11.

2

## II. BACKGROUND

The plaintiff was born on April 9, 1975, and was 29 years old at the time of the hearing before the ALJ. (Tr. 41, 70.) She graduated from high school with a regular high school degree at age 21. (Tr. 82, 143.) Although she obtained a regular high school diploma (Tr. 143), she received special education services beginning in the seventh grade. (Tr. 131,138-141.) In seventh grade, when the plaintiff was 15 years old, she was certified, based on standardized testing, by a school psychologist with a specific learning disability ("SLD") in the areas of basic reading skills and math reasoning. (Tr. 131, 136.) However, three years later, after taking IQ and other standardized tests, the same school psychologist found that the test results did not support certification of the plaintiff as learning disabled. (Tr. 141.) The plaintiff previously worked as a cashier at Kroger's until May of 2001, and as a CNA (certified nurse's assistant) at a nursing home from March to May of 2001. (Tr. 77.)

### A. Medical Records

Immediately after her motor vehicle accident on November 4, 2000, the plaintiff was taken to the emergency room ("ER") at the White County Hospital, where x-rays showed that her thoracic spine was "normal." (Tr. 183.) The ER notes reflect that the plaintiff had a past medical history of depression, GERD, and HTN, and was taking Desogen (an oral contraceptive), Monopril for high blood pressure, Paxil for depression, and Prevacid for her stomach problems. (Tr. 182.) On November 8, 2000, Dr. Ahmad Altabbaa of the White County Medical Associates prescribed physical therapy for the plaintiff for her cervical strain caused by the car accident (Tr. 206-207), and the plaintiff underwent physical therapy from November 9, 2000, through December 5, 2000, at the

3

conclusion of which she reported that "overall" her pain was "much better," and that she had met her long term goals. (Tr. 201-205.)

It appears that the plaintiff began seeing Dr. Abhay Kemkar, an internist, on January 2, 2001, when his impressions included whiplash injury, headache, and back pain. Dr. Kemkar prescribed Toradol[2] and Darvocet.[3] (Tr. 269-270.) The plaintiff continued to see Dr. Kemkar on January 3, 2001, February 8, 2001, and March 5, 2001 (Tr. 262-267), at which time she generally reported the same complaints–headaches and back and neck pain. On January 3, 2001, Dr. Kemkar prescribed Desogen, Prevacid, Paxil, Darvocet, and Norvasc.[4] (Tr. 267.) On January 22, 2001, the plaintiff reported that her headaches were "better," but she had an increase in her severe back pain, and Dr. Kemkar prescribed Atenolol,[5] Robaxin for pain, and a halter. (Tr. 265.) On January 29, 2001, the plaintiff continued to report increased back pain, and she was prescribed Vioxx,[6] Trazadene for depression, and Prevacid. (Tr. 264.) Although she reported "good relief from meds" on February 8, 2001, she also described her back as "killing" her and related that she was not sleeping at night. (Tr. 263.) An x-ray taken on February 8, 2001, showed "[n]o evidence of acute bony abnormality or fracture involved in the [thoracic] spine." On February 19, 2001, Dr. Kemkar certified that the plaintiff could return to work on light duty with a lifting restriction of 10-15 pounds. (Tr. 422.)

---

[2]Toradal is a nonsteriodal anti-inflammatory drug used to relieve "moderately severe, acute pain." Physicians' Desk Reference 1441 (6th ed. 2003) ("PDR").

[3]Darvocet is a mild narcotic analgesic prescribed for mild to moderate pain. PDR at 393.

[4]Norvasc is prescribed for angina (chest pain) and high blood pressure. PDR at 995.

[5]Atenolol is a beta blocker, prescribed for high blood pressure, angina and heart attacks. PDR at 1377.

[6]Although it has since been taken off the market, Vioxx was prescribed for arthritis and other "types of acute pain." PDR at 1540.

4

Upon referral from Dr. Kemkar, the plaintiff saw Dr. Leonardo R. Rodriguez-Cruz, a neurosurgeon, on March 19, 2001, who reported "primarily upper thoracic pain with no significant radiation down her lumber spine or up into the cervical region," which the plaintiff described as a "constant, dull ache" that she had experienced "off and on for the last six months," and which improved with medication and rest and was exacerbated by moving. (Tr. 254.) The plaintiff also reported that the physical therapy did not help her back pain but did provide "a great deal" of help for her whiplash. *Id.* Dr. Rodriguez-Cruz opined that the plaintiff was suffering from "a pathologic process involving the mid thoracic spine." (Tr. 253.)

Dr. Rodriguez-Cruz ordered an MRI, which was performed on March 28, 2001, and showed a thoracic disc on the left at the T6-7 and T7-8 levels, central disc protrusion at T5-6, and right paracentral disc protrusion at T12-L1. (Tr. 244.) On April 2, 2001, the plaintiff saw Dr. Rodriguez-Cruz, at which time she reported that she was able to work two jobs at Kroger's and the nursing home, respectively, and that, when she "aches a great deal," she takes over-the-counter pain medication and "ignores the pain." (Tr. 251.) Based on the MRI, Dr. Rodriguez-Cruz opined that the plaintiff had "fairly extensive degenerative disc disease in her lower thoracic spine given her age," but did not have thoracic disc cord compression. *Id.* During the April 2, 2001, visit, Dr. Rodriguez-Cruz completed a "Return to Work" Verification that the plaintiff could return to work that day, without any work restrictions. (Tr. 430.)

It appears that the plaintiff returned to Dr. Kemkar several times between March 30, 2001, and May 15, 2001, for a variety of complaints, including flu like symptoms, acute back pain from lifting at work, chest pains, and a rash. (Tr. 256-161.) She continued on essentially the same medications--Lotrel for high blood pressure, Atenolol, Paxil, and Prevacid and Desogen–during that

period of time, except that Dr. Kemkar discontinued the Protonix[7] on May 15, 2001, since he believed that it might have caused her rash, and prescribed Darvocet and Prednisone[8] instead. (Tr. 256.) On May 16, 2001, Dr. Kemkar certified that the plaintiff was able to return to work, with no limitations. (Tr. 428.)

The plaintiff returned to Dr. Rodriguez-Cruz on May 17, 2001, because her thoracic back pain was worse and she had developed intermittent right leg pain. (Tr. 250.) Dr. Rodriguez-Cruz opined the plaintiff was straining herself at work and ordered that she not work for two (2) weeks and that she participate in physical therapy again for a month thereafter. The plaintiff went to physical therapy nine (9) times from June 4, 2001, to June 26, 2001, during which time she reported that her pain had decreased from a "7" to "4" on a scale of one to ten. (Tr. 217.) The physical therapist noted that her "mobility and symptoms had decreased." Apparently, the physical therapist meant that her mobility limitations had decreased since her lumber spine range of motion and supine straight leg raising increased over her nine sessions. (Tr. 218.) The physical therapist recommended that the plaintiff continue exercising at home. *Id.*

After the plaintiff completed her physical therapy, she returned to Dr. Rodriguez-Cruz on June 29, 2001, at which time he related that she was "only somewhat improved after physical therapy," and that she reported that, although her neck and shoulder pain were "virtually gone," she still had severe thoracic/flank pain that had not "improved one bit." (Tr. 249.) As a result, Dr. Rodriguez-Cruz ordered a thoracic myelogram to "further document the disc anatomy and the

---

[7]Protonix blocks stomach acid and is prescribed for erosive esophagitis. PDR at 1175.

[8]Prednisone is a steroid used to reduce inflammation and symptoms of a variety of other conditions, including rheumatoid arthritis. PDR at 410.

bony anatomy and the spinal cord." At that visit, Dr. Rodriguez-Cruz also completed a Medical Certificate for the purpose of the plaintiff's filing for unemployment benefits, noting that her "thoracic disk herniation" necessitated her "leaving [her] usual work" from May 14, 2001, and that he was unable to determine when she would be able to return to work. (Tr. 103, 415.)

On July 12, 2001, Dr. Rodriguez-Cruz reviewed the results of the myelogram with the plaintiff. (Tr. 246.) Specifically, Dr. Rodriguez-Cruz found "some degenerative disc disease on the left side at T7/8" with no significant foraminal stenosis and very mild cord deflection. He explained that the plaintiff would not be "amenable" to surgery because of her degenerative disc disease, and referred her to a pain clinic for long-term care. *Id.* At that visit, Dr. Rodriguez-Cruz completed a form similar to what he had completed on June 29, 2001, that he could not determine when the plaintiff would be able to return to work, except that he stated on the June 29, 2001, form that, when she returned to work, she would not be able to lifT more than 25 pounds. (Tr. 102, 414.)

On August 30, 2001, Dr. Louise G. Patikas, a non-examining, consultative physician, completed a Physical Residual Functional Capacity ("RFC") Assessment, in which she opined that the plaintiff could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, stand and/or walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday. (Tr. 275.) Dr. Patikas found that the plaintiff had no limitations in pushing and/or pulling, or postural, manipulative, visual, or communicative limitations. (Tr. 275-278.)

The plaintiff saw Dr. Bonnie Enrico, a chiropractor, for neck and back pain on 19 occasions between December 21, 2001, through March 27, 2002 (Tr. 285-286), and on 11 occasions between February 28, 2004, and May 26, 2004. (Tr. 434.)

7

Upon referral from Dr. Kemkar, the plaintiff saw Dr. Daniel R. Lalonde, Jr., a neurologist, on May 22, 2002. Dr. Lalonde described the plaintiff as having "intractable chronic intrascapular pain" and assessed her with "longstanding posttraumatic cerviogenic headache syndrome likely in part related to greater occipital neuralgia, chronic intrascapular and low back pain likely related to some degenerative disc disease and musculoligamentous strain." (T. 380-382.) Dr. Lalonde noted her history of diabetes, cardiac dysrthythmia,[9] sinus "tachacardia" (sic),[10] depression, and polycystic ovaries, and that the plaintiff was taking "lupron depot, celexa,[11] prevacid, atenolol, glucophage,[12] and lotrin." (Tr. 381.) He conducted greater occipital nerve blocks and prescribed Zanaflex.[13] (Tr. 382.) However, on July 11, 2002, Dr. Lalonde reported that the plaintiff "continues to do poorly," that the Zanaflex did not appear to help her, and that the nerve blocks made her worse. (Tr. 376.) Dr. Lalonde determined that there was nothing more he could do to help the plaintiff and recommended that Dr. Kemkar refer her to a chronic pain specialist. *Id.* [14]

---

[9]Dysrthythmia is an abnormal, but not necessarily irregular, cardiac rhythm. Dorland's Illustrated Medical Dictionary 579 (30th ed. 2003) ("Dorland's").

[10]Presumably, Dr. Lalonde meant "tachycardia," which refers to a rapid heart beat. Dorland's at 1850.

[11]Celexa is prescribed for major depression. PDR at 288.

[12]Glucophage is used to treat diabetes. PDR at 633.

[13]Zanaflex relaxes tense, rigid muscles and is prescribed for muscle spasms. PDR at 1580.

[14]There is nothing in the plaintiff's medical records indicating whether or not Dr. Kemkar referred her to a pain specialist or, if not, why not. However, in his July 12, 2001, letter to Dr. Kemkar, Dr. Rodriguez-Cruz indicated that he had referred the plaintiff to a pain clinic for long term care, but "because of this being a car accident, many of the pain clinics are refusing to take her insurance." (Tr. 246.) However, in her testimony at the hearing before the ALJ, the plaintiff testified that, although she went to "pain clinics," she was not referred to a chronic pain specialist because she did not have insurance that would cover such treatment. (Tr. 455-456.) The Court notes that there is nothing in the plaintiff's medical records to show that she ever went to "pain

Upon request of the Commissioner, Dr. Kemkar completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" on July 17, 2003. (Tr. 372-375.) Dr. Kemkar found that the plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours and sit less than six hours in an eight hour day, and was mildly limited in her upper extremities. (Tr. 372-373.) He explained that the medical/clinical findings supporting those conclusions were the plaintiff's "dull on and off back pain." (Tr. 373.) Dr. Kemkar concluded that the plaintiff was not limited in her ability to climb, balance, kneel, or crawl, but could only occasionally crouch or stoop because of her "dull back pain." *Id.* Dr. Kemkar noted that the plaintiff had no manipulative or visual/communicative limitations (Tr. 374), and had environmental limitations only in the areas of temperature extremes, humidity/wetness, hazards, and fumes because she is "[a]llergic to perfume and gets agitated ? (sic) [with] hot temperatures." (Tr. 375.)

Upon referral from her attorney, Dr. Christopher A. Edwards, Ph.D., a psychologist, examined the plaintiff on May 10, 2004. (Tr. 393-396.) Dr. Edwards diagnosed the plaintiff with "Major Depressive Disorder, Single Episode, Moderate," and recommended individual psychotherapy and a psychiatric evaluation to determine if there were medications that she could take while breast feeding her child. (Tr. 396.) He noted that her inability to work following her car accident had a "significant effect on her self-confidence and self-esteem," and the "growing severity,"[15] coupled with her inability to take medication because she was breast feeding, has resulted in her "growing helplessness and hopelessness." *Id.*

_____

clinics."

[15]It is not clear whether Dr. Edwards was referring to the "growing severity" of her physical problems and pain or her depression.

9

Dr. Edwards completed a "Medical Opinion Ability to Do Work-Related Activities," and assessed the plaintiff's mental abilities and aptitude to perform unskilled work as "good" in all categories, except he rated her as "unlimited or very good" in her ability to ask simple questions or request assistance, and "fair" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, and "good" to "fair" in her ability to deal with normal work stress. (Tr. 384.) "Good" was defined as the "limited but satisfactory," and "fair" was defined as "seriously limited but not precluded." (Tr. 392.)

In the category of semiskilled and skilled work, Dr. Edwards assessed the plaintiff's abilities to understand and remember detailed instructions, to carry out detailed instructions, and to set realistic goals or make plans independently as "fair" and her ability to deal with stress as "good" to "fair." (Tr. 385.) He described her ability to interact with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness as "good," and her ability to travel in unfamiliar places and use public transportation as "fair." (Tr. 386.) He also opined that her ability to learn new tasks and new skills effectively would be impaired by her learning disability and depression. *Id.*

Most significantly, Dr. Edwards anticipated that the plaintiff would be absent from work more than three times a month "@ [at] present due to depression." (Tr. 387),[16] would need to take unscheduled breaks 1-2 hours during an eight hour workday, and would be incapable of even

---

[16]On another portion of the form, Dr. Edwards opined that the plaintiff would be likely to be absent from work more than "four times a month." (Tr. 389.) That difference is because the Medical Source Statement included two separate questions, each seeking virtually the same information, with one providing the most restrictive category of "more than three times a month" and the other providing the most restrictive category of "more than four times a month."

10

tolerating even "low stress" jobs. (Tr. 389.) In conclusion, Dr. Edwards explained that the plaintiff's depression is "related to [her] physical impairment, but chronic" and that the "continued worsening of physical problems will lead to some of psychological issues," and he assessed her with a GAF of 52.[17] (Tr. 387.)

Dr. Edwards also noted a caveat that the plaintiff's responses to the Minnesota Multiphasic Personality Inventory ("MMPI") were similar to those of people who respond "in a somewhat exaggerated and overly pathological manner." (Tr. 395.) However, Dr. Edwards opined that the plaintiff's responses were likely "due to a cry for help, or desire to seek out assistance for treatment, as opposed to a blatant attempt to be deceptive in her response patterns." *Id.*

**B. Hearing Testimony**

**(1) The Plaintiff's Testimony**

The plaintiff testified, that before her car accident, she had worked at Kroger's in every department, except the office, stood eight (8) hours a day, except when at lunch and on breaks, and routinely lifted 25-pound bags of dog food and cases of milk over her head when she was shelving them. (Tr. 453.) The plaintiff also worked in a nursing home for a "couple of months" after the accident, where she was required to lift 75 pounds, but was later discharged when she could not lift the patients by herself. (Tr. 454.)

According to the plaintiff, she was "real active" before the car wreck; she helped her mother and brothers with their grass cutting summer business by weed eating and push mowing, she helped

---

[17]A Global Assessment Functioning ("GAF") score of 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." Am Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

her parents "build their house from the ground up," and she and her husband "would go out and do things." (Tr. 454-455, 459.) The plaintiff reported that the "pain clinics" had tried to assist her by prescribing drugs which made her sleep "all the time." (Tr. 455-456.)[18] The plaintiff explained that, although Dr. Lalonde recommended that Dr. Kemkar[19] refer her to a pain specialist, "they just couldn't find anybody that would accept TNCare," so that she dealt with the pain by taking her prescription medication, going to a chiropractor, and using ice and heat. (Tr. 456-457.)

The plaintiff testified that, during her recent pregnancy, she had been unable to go to the chiropractor, and she had not been permitted to take medication for her sinus tachycardia (fast heartbeat) or depression. (Tr. 457-458.) According to the plaintiff, she was going to have to quit breast feeding her baby, because her depression was getting worse, and she needed to resume taking her medication. (Tr. 458.) The plaintiff related that, before she had her baby, she would "go pay" a bill for her husband, go to her mother's home to visit, grocery shop for dinner and "cook supper." (Tr. 466.)

The plaintiff gauged her pain level as a 7 on a scale of 1-10. (Tr. 459.) She testified that her husband has to wash and dry the clothes and wash the dishes, and that she is only able to make "smaller meals at suppertime." *Id.* The plaintiff testified that she could not "sit or stand for long periods" without hurting, and that she had to sit down or stand up every ten minutes or so. (Tr. 459-460.) The plaintiff also testified that she had high blood pressure, for which she was on medication, that she had trouble sleeping at night because her arms went numb, and that she had developed

---

[18]*See supra* at 8 & n.14.

[19]Dr. Lalonde's sur-name is misspelled "Milando" and Dr. Kemkar's sur-name is misspelled "Kinkarr" in the transcript.

additional problems since the accident, including knee pain, urinary control problems, constipation, and memory problems. (Tr. 460-462.)

The plaintiff also testified that she was depressed most of the time because she "hate[d] not being able to do what I used to do, help my husband, be the wife that I should be." (Tr. 462.) The plaintiff related that she lifts her baby "[a]s little as possible," and her mother, her husband, and her husband's grandmother always carry the baby. Although she takes care of her baby when her husband is at work, her mother and her husband's grandmother help her with the housework and the baby. (Tr. 462-466.)

### (2) Vocational Expert's Testimony

Jane Brenton, a vocational expert ("VE"), testified at the hearing that the plaintiff's prior work classification ranged from light to heavy, unskilled to semiskilled. (Tr. 469.) Referring to Dr. Patikas' August 30, 2001, RFC Assessment (Tr. 274-281), the ALJ asked the VE to consider a "younger individual" with a high school education, but "an indication of learning disabilities . . . in the areas of language, reading, [and] writing," *i.e.*, a "broad" reading grade equivalent of 6.2, a math grade equivalent of 7.3, and written language grade equivalent of 3.4, and who has the ability to lift as much as 50 pounds, and 25 pounds frequently, to stand and walk for six hours, and to sit for six hours. (Tr. 469-470.) The VE responded that a person so described would have "medium" exertional capacity and would be able to perform the plaintiff's past work at Kroger's. (Tr. 470.)

Referring to Dr. Kemkar's July 17, 2003, Medical Source Statement, the ALJ modified the hypothetical to include the ability to lift no more than 20 pounds, to lift 10 pounds frequently, to stand and walk for six hours, and to sit for six hours; a "mild" limitation in the upper extremities,

13

including "dull on and off back pain" that limits lifting activities and affects reaching, handling, fingering and feeling, postural limitations that allow crouching and stooping only occasionally, and "no visual communicative, communicative limitations," but environmental restrictions, including avoiding exposure to temperature extremes, vibration, hazardous equipment, unprotected heights, and concentration of perfumes, odors, chemicals and gasses. (Tr. 471.) The VE testified that a person with these limitations could perform the full range of light work, including cashiering as long as she was not required to stock. *Id.*

The VE also testified that a 25 pound weight restrictions as provided by Dr. Rodriguez-Cruz would still allow the plaintiff to perform the full range of light work. (Tr. 471.) According to the VE, a sit-stand option would preclude the plaintiff from working at her previous job as a cashier, but would permit the plaintiff to work as a seated cashier, and there were approximately 6,500 such jobs in Tennessee. (Tr. 462.) The VE also testified that there were 1,400 companion jobs and 6,000 night security guard jobs in Tennessee in which the plaintiff could work. (Tr. 472.) The VE explained that these jobs were unskilled, entry level positions that the plaintiff could do despite her "academic or cognitive deficits." (Tr. 472-473.)

The ALJ added to the hypothetical by describing a person with "a level of pain that rises above a moderate level and endures . . . essentially is present at all times, constant, not relieved" such that the ability to "concentrate, persist, and maintain work, perhaps even to attend work" is affected. (Tr. 473.) The VE concluded that such a person would not be able to perform any work. *Id.*

Referring to Dr. Edwards' May 22, 2001, mental assessment of the plaintiff's nonexertional impairments (Tr. 384-392), the ALJ modified the hypothetical to include a "fair" capacity to

14

function in certain areas, and a "good" capacity to function in others.[20]  (Tr. 473-74.)  The VE testified that, using the ALJ's fair-good parameters, the person would still be able to do entry level unskilled work.  (Tr. 474.)  The VE also testified that a GAF of 52 would still allow unskilled, entry level work.  *Id.*  However, considering all of Dr. Edward's assessment, the VE concluded that the plaintiff would not be able to work at all.  *Id.*  In addition, the VE testified that, if the plaintiff were able to lift no more than ten pounds, could only stand and walk two hours a day, and could sit for up to six hours, she would be limited to sedentary work.  (Tr. 475.)

Plaintiff's counsel asked the VE the following question:

> If we combined the 52 GAF with the requirement of low stress and the expectation of . . . being absent four times . . . a month . . . what kind of jobs could she do?

The VE replied, "None."  (Tr. 475.)

## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on December 15, 2004, with the following findings:

1. The plaintiff meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's impairments of degenerative disc disease of the thoracic spine and depression are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

---

[20]The ALJ defined "fair" as "seriously limited, but not precluded," and "good" as "limited, but satisfactory."  (Tr.  474.)

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, of Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: lift and carry twenty pounds occasionally and ten pounds frequently, and she requires a sit or stand option.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs are set out in the body of the decision.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 3404.1520(g)).

(Tr. 30-31.)

16

# IV. DISCUSSION

## A.    Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).  A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)).  The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination.  42 U.S.C.A. § 405(g). <u>*See, e.g., Houston v. Sec'y of Health & Human Servs.*</u>, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

17

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Secretary of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520 and 416.920). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R.

18

§§ 404.1520(d) and 416.920(d)).  The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Secretary of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988).  The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Secretary of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances).  It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391.  Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform,

19

she is not disabled.[21]  *Id.  See also Tyra v. Secretary of Health & Human Servs.*, 896 F.2d 1024,

1028-29 (6th Cir. 1990); *Farris v. Secretary of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir.

1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process,

the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative

process is appropriate in some circumstances**.**

## B.    The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five step process.  At step

one, he determined that the plaintiff had not engaged in substantial gainful activity since her alleged

onset date.  (Tr. 30.)  At step two, the ALJ determined that the plaintiff's "thoracic disc protrusion,"

"intractable pain," and "depression" were severe impairments.  (Tr. 28, 30.)  At step three, the ALJ

found that  the plaintiff's impairments did not meet or medically equal one of the listed impairments

in Appendix 1 Subpart P. Regulation 404.  *Id.*  At step four, the ALJ determined that the plaintiff's

residual functional capacity ("RFC") precluded her from performing any of her past relevant work.

(Tr. 29-30.)  At step five, the ALJ concluded that the plaintiff had the RFC to perform a significant

range of light work and that there were a significant number of jobs in the national economy that the

plaintiff could perform.  (Tr. 29-31.)

---

[21] This latter factor is considered regardless of whether such work exists in the immediate
area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff
would be hired if she applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

20

The effect of this decision was to preclude the plaintiff from DIB benefits and to find her not disabled, as defined in the Social Security Act, at any time after May 14, 2001, through the date of the decision.

## C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ failed to consider or misapplied 20 C.F.R. § 404.1527 in evaluating Dr. Edward's medical opinions, failed to follow Social Security Rulings ("SSR") 96.5 and 96.5p by failing to seek clarification and failing to explain his rejection of Dr. Edwards' opinion, failed to consider or misapplied 20 C.F.R. § 1529 regarding the plaintiff's exertional and nonexertional limitations, failed to consider or misapplied 20 C.F.R. § 404.1529 and SSR 96-7p by finding that the plaintiff's allegations regarding her limitations were not totally credible, and failed to rely on accurate hypothetical questions, and that there is not substantial evidence in the record to support the ALJ's finding that the plaintiff was not disabled.

### 1. Whether the ALJ Failed to Consider/ Misapplied the Factors in 20 C.F.R. § 404.1527 When He Evaluated Dr. Edwards' Medical Opinion

Although the plaintiff does not specifically set out the factors in 20 C.F.R. § 404.1527 that she contends the ALJ failed to consider or misapplied, she asserts that the ALJ erred in his "summary dismissal of Dr. Edward's opinion as 'speculative,'" because there was no "countervailing evidence in the record." Docket Entry No. 11, at 9. At issue is Dr. Edwards' opinion that the plaintiff would be absent from work "[m]ore than four times a month" for psychological reasons. (Tr. 389.) The crux of the plaintiff's argument is that a "treating physician's

21

opinions, based on objective evidence, should be accorded significant weight" and, "[i]f uncontradicted, the physicians' opinions are entitled to complete deference." Docket Entry No. 11, at 10.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective of the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Bogle v. Sullivan,* 998 F.2d 342, 347-348 (6th Cir. 1993). This is commonly known as the "treating physician rule." *See* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r,* 378 F.3d 541, 544 (6th Cir. 2004).

However, a "treating physician" is one who has seen a claimant "several times over a period of months." *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983). Dr. Edwards saw the plaintiff once on May 10, 2004, to conduct "a psychological evaluation . . . pursuant to her application for disability benefits." (Tr. 393.) Thus, Dr. Edwards was a "nontreating physician," as defined by 20 C.F.R. § 404.1502,[22] not a treating physician. The opinion of a "consulting" or

---

[22]A nontreating source is defined as:
> a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source.

Case 2:05-cv-00048   Document 14   Filed 09/08/09   Page 22 of 38 PageID #: 74

"nontreating" physician is not entitled to the deference due the opinion of a "treating physician." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The ALJ did not specify what specific weight he attributed to Dr. Edwards' opinions. However, he did note that Dr. Edwards' opinions supported the conclusion that the plaintiff's mental impairments resulted "in mild restrictions in daily living, mild difficulties in maintaining social functioning, and moderated deficiencies of concentration, persistence, and pace." (Tr. 29.)

Although the ALJ may not reject the favorable opinion of a consulting physician solely because the examination was arranged by the plaintiff, *Blankenship v. Bowen*, 874 F.2d 1116, 1122 n.8 (6th Cir. 1989), the ALJ may nevertheless reject an uncontradicted expert opinion by a consulting psychologist hired by the plaintiff based on the ALJ's analysis of the psychological findings. *See Crisp v. Secretary of HHS*, 790 F.2d 450 (6th Cir. 1986). The ALJ concluded that there was "no evidence that the [plaintiff] experience[d] episodes of decompensation in work-like settings of extended duration," and that Dr. Edwards' opinion that the plaintiff would be absent from work "up to four times a month"[23] was speculative since it was based on a one-time evaluation. (Tr. 29.)

In his Medical Opinion, Dr. Edwards checked the space indicating that the plaintiff would be likely to be absent from work more than four times a month (Tr. 389), and the space in the report corresponding to absences of "[m]ore than three times a month," writing adjacent to the latter, "@ [at] present due to depression." (Tr. 387.) However, Dr. Edwards offered no opinion regarding whether the impairment had lasted, or would last, twelve months as required by 20 C.F.R.

---

20 C.F.R. § 404.1502.

    [23]As addressed *supra* at 10 & n.16, Dr. Edwards did not indicate "up" to four times a month, but rather "more than" four times a month. (Tr. 389.) *See also* Tr. 287. However, that misstatement is not significant.

23

§ 404.1577.  *See Listenbee v. Secretary of HHS*, 846 F.2d 345, 350 (6th Cir. 1998).  Dr. Edwards did

not provide any explanation for his opinion on the plaintiff's expected absenteeism nor did he

provide any specific support for that opinion.  Thus, the ALJ did not err in finding that  Dr.

Edwards' opinion was conclusory.  The ALJ is not bound by conclusory opinions of medical

professionals.  *See Casey v. Sullivan*, 987 F.2d 1230, 1234 (6th Cir. 1996); *King*, 742 F.2d at 973;

*Duncan v. Secretary of HHS*, 801 F.2d 847, 855 (6th Cir. 1986).

The plaintiff argues that Dr. Edwards "reviewed numerous sources of information including

[the plaintiff's] medical records and psycho educational evaluations" in reaching his conclusion.

Docket Entry No. 11, at 10-11.  However, the fact that Dr. Edwards reviewed all available medical

records does not make his opinion any less speculative or conclusory.

It appears that the only record that Dr. Edwards reviewed–or at least the only record to which

he referred-- pertaining to the plaintiff's psychological health "was a psychoeducational evaluation

carried out for [the plaintiff] while she was in high school."  (Tr. 138-141, 393.)  That evaluation

was conducted on October 27, 1993,  more than ten and one-half (10½) years before Dr. Edwards'

examination of the plaintiff on May 10, 2004.[24]  The psychoeducational evaluation made no

reference whatsoever to behavioral problems, depression, or other issues from which Dr. Edwards

might have concluded that the plaintiff would have three or four or more absences per month in the

workplace for psychological reasons.  In fact, the evaluation concluded that the plaintiff's test results

did not support certifying the plaintiff as having a learning disability.  (Tr. 141.)  Moreover, apart

from noting that the plaintiff had "difficulties in particular areas of language arts, as well as

---

[24]Although the same examiner authored an Integrated Assessment Report on November 18,
1990 (Tr. 132-136), it does not appear that Dr. Edwards relied on that report since it was conducted
when the plaintiff was in the seventh grade, and, in any event, it was even more remote in time.

24

apparently math," with "intellectual abilities . . . estimated to be within the low average to average range," Dr. Edwards made no effort to link the earlier evaluation to his opinions relating to the plaintiff's psychological capacity to work. (Tr. 393.)

In addition, as Dr. Edwards noted, the plaintiff was able to graduate from high school, albeit at least two years late, with a regular high school degree. Perhaps more significantly, the plaintiff was able to maintain consistent employment with the same employer for eight years, despite her intellectual and learning deficits.

With respect to the medical treatment records to which Dr. Edwards referred, apart from including the plaintiff's medical history in the "Background Information" section of his report, he mentioned the plaintiff's physical complaints only once in the evaluation section: "Of note, [the plaintiff] reported multiple medical complications, including high blood pressure, diabetes, endometriosis, polycystic ovaries, GERD, and degenerative disc disease." (Tr. 393-95.) In his report, Dr. Edwards referred to the plaintiff's medical condition as follows:

> [The plaintiff] reported that she was involved in a motor vehicle accident in November of 2000, which resulted in significant physical problems since that time. As a result of this accident, she has been unable to work, due to the pain that she experiences on a daily basis. She is apparently a poor candidate for surgery, due to the limited chance of success. She reported that she is currently unable to work due to the pain that has been the result of this accident, which has also had a significant effect upon her self-confidence and self-esteem.

(Tr. 396.) However, there was nothing in Dr. Edwards' report from which the ALJ could reasonably have concluded that the plaintiff would have more than three or four absences from work each month for psychological reasons. In addition, the ALJ specifically noted Dr. Edwards' own "caveat" that the plaintiff's responses "may have been exaggerated and overly pathological." (Tr. 28, 295.)

25

The ALJ did not err in characterizing Dr. Edwards' monthly-absenteeism opinion as "speculative," nor did he err in not giving controlling weight to Dr. Edwards' opinion.

2.    **Whether the ALJ Failed to Follow Social Security Ruling 96.5 and 96.5p[25] by Failing to Clarify Dr. Edwards' Medical Opinion and for not Providing an Appropriate Explanation for Rejecting Dr. Edwards' Opinion**

The plaintiff asserts first that, "[if] the ALJ was not sure upon what Dr. Edwards based his opinion that [the plaintiff's] impairments would cause her to be absent from work 'more than four times a month,' he was required to "make every reasonable effort to contact Dr. Edwards and his sources . . . for clarification . . . ." Docket Entry No. 11, at 12.

The plaintiff provides no reference to the record in support of her underlying premise that the ALJ was uncertain and/or confused about Dr. Edwards' monthly-absenteeism opinion. A plain reading of the decision shows that the ALJ's decision was based on the "speculative" nature of Dr. Edwards' opinion. Absent any indication of uncertainty and/or confusion in the record, the ALJ was not required to "contact Dr. Edwards and his sources for clarification." Moreover, the duty of the ALJ to inquire further pertains to "treating sources." SSR 96.5p, 1996 WL 374183 *6 (S.S.A. July 2, 1996). As previously addressed, Dr. Edwards was a consulting psychologist. Thus, even if the record showed that the ALJ were uncertain and/or confused about Dr. Edwards' opinion, SSR 96.5p imposed no obligation on him to contact Dr. Edwards and/or his sources for clarification.

The plaintiff argues that "the ALJ failed to provide an appropriate explanation for rejecting Dr. Edward's [sic] opinion . . . ." Docket Entry No. 11, at 12. However, in rejecting his opinion,

_____

[25]Although the plaintiff refers to SSR 96.5 and 96.5p, the actual ruling is SSR 96-5p. *See* 1996 WL 374183 (S.S.A. July 2, 2996).

the ALJ referred to the following related opinions attributable to Dr. Edwards: (1) the plaintiff's responses during his evaluation may have been "exaggerated and overly pathological;" (2) the plaintiff had a "fair ability to complete a normal workday and workweek without interruption from psychologically based symptoms;" (3) the plaintiff had a "fair" ability to "perform at a consistent pace, deal with normal work stress;" and (4) the plaintiff had a GAF score of 52. (Tr. 28-29.) Significantly, the ALJ also noted that Dr. Edwards' opinion on her expected monthly absenteeism opinion was "based on a one-time evaluation." (Tr. 29.)

The plaintiff also argues that the ALJ erred in not referring to or providing a reason to reject the opinions of Dr. Lalonde, who examined the plaintiff twice, the first time in May, 2002, and the second time in July, 2002 (Tr. 376-79).

The ALJ did not refer to Dr. Lalonde's opinions in his decision. However, apart from noting that the plaintiff had a medical history of "[d]epression" (Tr. 378), there was nothing in Dr. Lalonde's medical reports that would have aided the ALJ in assessing Dr. Edwards' opinion of the plaintiff's psychological capacity to work, either with respect to his monthly-absenteeism opinion, or otherwise.[26] Moreover, the plaintiff does not make any effort to link Dr. Lalonde's opinions pertaining to the plaintiff's physical problems/restrictions to Dr. Edwards' opinions pertaining to her psychological capacity to work. Absent any apparent link, the ALJ did not err in not referring to Dr. Lalonde's opinions in the context of Dr. Edwards' opinions, nor did he err in not explaining why he did not consider Dr. Lalonde's opinions in that context.

---

[26]The plaintiff refers specifically to Dr. Lalonde's report of July 11, 2002. In that report, Dr. Lalonde notes only that the plaintiff continues to suffer back pain, and recommends that she "talk[] to Dr. Kemkar about a chronic pain specialist referral." (Tr. 376.)

27

In addition, Dr. Lalonde was not a treating physician, having examined the plaintiff only two times. Therefore, the requirement that the ALJ provide "good reasons" for rejecting the opinions of treating physicians[27] does not apply to the opinions of Dr. Lalonde.

Finally, the plaintiff claims that the ALJ erred in not referring to Dr. Rodriguez-Cruz's July 12, 2001, letter and "Return to Work Verification" (Tr. 414 and 246) in the context of Dr. Edwards' opinion, and in not providing an explanation for rejecting Dr. Rodriguez-Cruz's opinion. Docket Entry No. 11, at 12.

The ALJ accorded "great weight" to Dr. Rodriguez-Cruz's medical opinions and specifically referred to Dr. Rodriguez-Cruz's report of July 12, 2001. (Tr. 28-29, 246.) Consequently, the record does not support this part of the plaintiff's contention. Furthermore, the plaintiff has made no effort to link Dr. Rodriguez-Cruz's opinions in his July 12, 2001, report concerning the plaintiff's physical condition/restrictions to Dr. Edwards' opinion pertaining to her ability to work from a psychological perspective. Absent a link between the two, there is no error, either in terms of the ALJ's assessment or his explanation pertaining to that assessment.

On July 12, 2001, Dr. Rodriguez-Cruz also completed a "Return to Work/School Verification." (Tr. 414.) Although he indicated that the date for the plaintiff to return to work was "unknown," there is nothing in the document that would have assisted the ALJ in assessing Dr. Edwards' opinions about the plaintiff's psychological condition. More particularly, there is nothing in the document that suggests the plaintiff's "unknown" return date has anything to do with her psychological condition. On the contrary, it can easily be inferred from the only other comment on the document – "no lifting more than 25 lbs when she returns" – that the verification was based

_____

[27]*See* SSR 96-2p, 1996 WL 372188 *5, citing 20 C.F.R. § 404.1527(d)(2).

28

on her physical consideration. Here too, the plaintiff has made no effort to link what appears to be a purely physical matter to Dr. Edwards' purely psychological perspective on the case. Again, absent any link, there is no error.

In her reply, the plaintiff cites to references in the record of her history of depression both before and after her alleged onset date. *See, e.g.,* Tr. 149-151, 155-157, 174, 182, 193-195, 256-264, 266-267, 270, 349, 387, and 411-412. However, except for her postpartum examination on March 24, 2004 (Tr. 411-412), and an anxiety attack on June 17, 2000, apparently related to her father's recent illness (Tr. 195), all of those records simply reflected a history of depression and prescription medication for depression. As the ALJ noted, there is no evidence in the record that the plaintiff ever had "episodes of decompensation in work-like settings of extended duration." (Tr. 29.) No health care provider ever referred her to a psychiatrist, psychologist, or other mental health provider. Clearly, she was treated conservatively with medication and there is no indication whatsoever in the record, other than Dr. Edwards' assessment, that the plaintiff needed any further mental health treatment.

The ALJ did not err because he did not contact Dr. Edwards and/or his sources to clarify Dr. Edwards' monthly-absenteeism opinion, nor was the ALJ's explanation for rejecting Dr. Edwards' opinion inadequate. Neither did the ALJ err in failing to refer to and/or consider Dr. Lalonde's opinion or in his consideration of Dr. Rodriguez-Cruz's opinion.

### 3. Whether the ALJ Failed to Consider/Misapplied the Factors in 20 C.F.R. § 404.1529 Regarding the Plaintiff's Exertional and Nonexertional Limitations

The plaintiff asserts that the ALJ disregarded the definition of "fair" used by Dr. Edwards in his opinion of the plaintiff's psychological ability to work. Docket Entry No. 11, at 13. In the assessment, "fair" was defined as an "[a]bility to function [that] is seriously limited but not precluded." (Tr. 392.) It is not clear whether the plaintiff contends that the ALJ should have considered Dr. Edwards' opinion of the plaintiff's psychological ability to work in step three or step five. However, it appears that the plaintiff maintains that Dr. Edwards' several "fair" determinations in his assessment of her psychological capacity to work (Tr. 384-386) establish that she is disabled.

Therefore, it is worthy of note that, whereas a psychologist's opinion that a claimant's ability to function is "fair," *i.e.*, "seriously limited but not precluded," applies at step three to determine whether a psychological impairment meets or medically equals a listed impairment, the same does not apply to establish disability at step five where the issue is the claimant's residual functional capacity. *Sullenger v. Commissioner of Social Security*, 255 Fed.Appx. 988, 993-94 (6th Cir. Nov. 28, 2007). Dr. Edwards' categorizations of the plaintiff's ability to work in certain areas as "fair," by its own definition, does not mean that the plaintiff is precluded from such work. *See Colvin v. Barnhart,* 475 F.3d 727, 731 (6th Cir. 2007).

The plaintiff once again argues that the ALJ disregarded her "other treating physicians' opinions," in particular, the opinion of Dr. Rodriguez-Cruz. Docket Entry No. 11, at 13. Apart from Dr. Rodriguez-Cruz, the plaintiff does not identify in this portion of her memorandum the "other" treating physicians to whom she is referring. To the extent that the plaintiff refers to Dr. Rodriguez-Cruz's opinion, the Court has already addressed the plaintiff's arguments, *supra* at 27-28.

30

To the extent that the plaintiff refers to Dr. Kemkar's opinions, the basis for the plaintiff's objection is not clear from her memorandum. The ALJ clearly afforded "great weight" to the opinions of Dr. Kemkar, along with Dr. Rodriguez-Cruz, both treating physicians. However, in her reply, the plaintiff argues that the ALJ should not have considered Dr. Kemkar's July 17, 2003, Medical Source Statement (Tr. 372-375), because he had not treated the plaintiff since May 15, 2001, and he was not aware of treatment she received thereafter from Dr. Lalonde and Dr. Rodriguez-Cruz. Docket Entry No. 13, at 2-4. It is not clear from the record when or if Dr. Kemkar stopped treating the plaintiff. However, the record contradicts the plaintiff's assertions that Dr. Kemkar was unaware of Dr. Rodriguez-Cruz's opinion of July 12, 2001 (Tr. 246), and Dr. Lalonde's opinion of July 11, 2002 (Tr. 376.)[28] Dr. Kemkar saw the plaintiff on August 9, 2001 (Tr. 255), and apparently continued to be involved in the plaintiff's treatment because he referred her to Dr. Lalonde in May of 2002, (Tr. 380). Dr. Rodriguez-Cruz sent his July 12, 2001, report to Dr. Kemkar, and Dr. Lalonde reported to Dr. Kemkar in May and July of 2002. (Tr. 376-383.) Clearly, Dr. Kemkar was aware of the treatment provided by and opinions of Dr. Lalonde and Dr. Rodriguez-Cruz.

---

[28]In July of 2003, the Commissioner asked Dr. Kemkar to provide updated medical records from August 10, 2001, forward (Tr. 371), but apparently Dr. Kemkar did not forward any updated records. *See* Tr. 4. It is impossible to determine whether Dr. Kemkar was no longer treating the plaintiff after August 10, 2001, or whether he simply failed to provide his records as requested. However, Dr. Kemkar clearly had additional records relating to the plaintiff since he received reports from Dr. Lalonde and Dr. Rodriguez-Cruz as addressed above.

31

4.    **Whether the ALJ Failed to Consider/Misapplied the Factors under 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p in Determining that the Plaintiff's Claims of Limitations Were Not Totally Credible**

The plaintiff asserts that the ALJ's determination that she "did not experience any pain or other symptomology of a disabling level of severity on an ongoing basis" is not supported by the record, or by the application of 20 C.F.R. § 404.1529 and/or SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).  Docket Entry No. 11, at 14.  The plaintiff attempts to support her claim with numerous references to the record in which the plaintiff's physical pain is documented. *Id.* at 14-15.  The plaintiff asserts further that the ALJ "failed to follow the SSA guidelines in evaluating the severity of [the plaintiff's] subjective complaints of pain," and that he "compounded this error" by discounting the medical evidence that indicated the "underlying medical condition was of such severity that it reasonably could have been expected to produce the alleged disabling pain." *Id.* at 16.

In his decision, the ALJ states specifically that the plaintiff's "subjective complaints including allegation of pain have been evaluated as required under the applicable ruling[s] and regulations such as 20 CFR 404.1529 and Social Security Ruling 96-7p." (Tr. 29.)  The plaintiff cites thirteen instances that the ALJ did not refer to or consider as "credible" evidence of her severe pain.  Docket Entry No. 11, at 14-15.

The ALJ specifically referred to the White County emergency room record reflecting the plaintiff's "chest and back pain," dated November 4, 2000, following her car accident.  (Tr. 28.)  Although the ALJ did not specifically refer to the follow up treatment records from White County Medical Associates (Tr. 144-146) from November  6, 2000, through November 15, 2000, those records reflected that her complaints included the flu, and neck, chest, and back pain immediately

following her car wreck. Although her chest and neck pain[29] are not at issue in this case, there is no question that the plaintiff suffered from pain after her accident. However, she was able to return to work for approximately six months thereafter, and her alleged onset date is not immediately after her car accident but approximately six months thereafter.

Although the ALJ did not refer to the specific physical therapy progress notes from November 8, 2000, through December 5, 2000 (Tr. 201-209), he clearly considered the physical therapy reports since he referred to the June 26, 2001, report, at the conclusion of her physical therapy sessions. (Tr. 28, 271.) Again, the physical therapy progress notes from November 8, 2000, through December 5, 2000, precede the plaintiff's alleged onset date. In addition, the physical therapy discharge summary dated December 8, 2000, indicated that "overall [the plaintiff's] pain [was] much better" and that she had met her long term goals. (Tr. 201.)

Even though the ALJ did not specifically refer to Dr. Rodriguez-Cruz's letter of April 2, 2001 (Tr. 251-253), his report on May 17, 2001 (Tr. 250), or his report dated June 29, 2001 (Tr. 249), the ALJ noted that Dr. Rodriguez-Cruz later reported on July 12, 2001 (Tr. 246), that the plaintiff had degenerative disc disease, which was reflected in the March 28, 2001 MRI (Tr. 243) that he had ordered. (Tr. 28.) In the April 2, 2001, report, Dr. Rodriguez-Cruz related that the plaintiff had reported that her "pain is better" and, "when she aches," she takes over-the-counter pain medication and "ignores the pain." (Tr. 251.) On May 17, 2001, Dr. Rodriguez-Cruz related that the plaintiff reported that her back pain was made "much worse by her repetitive lifting while at work" and he opined that she "may be straining herself at work." (Tr. 250.) Therefore, he advised her to stay out of work for two weeks and then undergo intense physical therapy for a month. *Id.*

---

[29]Apparently, the plaintiff's neck pain had abated by June of 2001. *See* Tr. 249.

33

In his June 29, 2001, report to Dr. Kemkar, Dr. Rodriguez-Cruz noted that the plaintiff still had "severe thoracic/flank pain" and ordered a thoracic myelogram. (Tr. 249.) Dr. Rodriguez-Cruz addressed the results of the myelogram in his July 12, 2001, report, in which he also recommended a pain clinic for long-term care (Tr. 246), to which the ALJ specifically referred. (Tr. 28.) The ALJ did not specifically refer to Dr. Rodriguez-Cruz's July 12, 2001, Return to Work form, which simply indicated that he did not know when the plaintiff could return to work but when she did return, she would be restricted from lifting more than 25 pounds. (Tr. 414.) Since the form did not require Dr. Rodriguez-Cruz to include a weight restriction if the plaintiff were not released to work, it is clear that Dr. Rodriguez-Cruz expected that the plaintiff would be released to work at some date, although he was not sure when. It should be noted that the ALJ found that the plaintiff was restricted to lifting 20 pounds, which was less than Dr. Rodriguez-Cruz's 25 pound restriction in the July 12, 2001, form. (Tr. 30.)

It does not appear that the ALJ considered the records of Dr. Enrico, the plaintiff's chiropractor, dated December 21, 2001, through March 27, 2002 (tr. 282-292), and February 25, 2004, through May 26, 2004. (Tr. 434). However, apart from noting the plaintiff's symptoms, there is no accompanying analysis, diagnosis, or anything else in those records from which a determination of disability might be based. Finally, although the ALJ did not refer to Dr. Lalonde's medical records, dated May 22, 2002, and July 11, 2002, the plaintiff testified about his opinions at the hearing before the ALJ. (Tr. 383, 456.)

The ALJ clearly considered the relevant medical records, particularly those of the plaintiff's treating physicians, addressing the plaintiff's pain and limitations. It appears that the plaintiff is

34

essentially arguing that the ALJ erred in his consideration of those records and failed to properly evaluate the severity of the plaintiff's subjective complaints of pain to her health care providers.

Both the Social Security Administration ("SSA") and the Court of Appeals for the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[30] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). The SSA also provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).[31] The ALJ

---

[30] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

[31] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

35

cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).

There is objective medical evidence of the plaintiff's underlying physical medical condition of degenerative disc disease. This objective medical evidence satisfies the first prong of the *Duncan* test. However, there is insufficient objective medical evidence confirming the severity of the pain that the plaintiff attributes to this condition. The Sixth Circuit has noted that "[w]ithout such evidence, this Court will generally defer to the ALJ's assessment." *Hash v. Comm'r of Soc. Sec.*, 309 Fed.Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990). The ALJ concluded that objective medical evidence did not support the plaintiff's complaints of pain. (Tr. 29.)

The ALJ determined that the plaintiff could not return to her previous employment, but based on the opinions of her treating physicians, Dr. Kemkar and Dr. Rodriguez-Cruz, she was able to perform a significant range of light work with restrictions of not lifting more than 20 pounds occasionally and ten pounds frequently and having a sit and stand option. (Tr. 29.) Her treating physicians did not indicate that her pain was so severe that she could not work at all. Based on the opinions of her treating physicians, there was substantial evidence in the record to support the ALJ's determination that the plaintiff's pain did not preclude her from performing light work. He specifically referred to the plaintiff's taking care of her newborn child and performing household chores. (Tr. 29.)[32] Significantly, the plaintiff testified that she was able to engage in more daily

---

[32]Although in the November 29, 2001, Activities of Daily Living Questionnaire, the plaintiff related her limitations in performing household chores and other daily activities, she also reported that she drives to the store 1-2 times a week and, with help from her husband, prepares supper.

activities before her child was born and that she was not able to take her prescription medication for both her physical and psychological problems while she was pregnant and during the time she was breast feeding.  (Tr. 466, 457-458.)

5.    **Whether the ALJ Relied on Accurate Hypothetical Questions in Determining That the Plaintiff Was Not Disabled**

The plaintiff contends that the ALJ relied on inaccurate hypothetical questions in determining that she was not disabled.  The plaintiff argues that the ALJ should not have relied upon the assessment of Dr. Patikas, a non-treating, non-examining consultative physician, and the assessment of Dr. Kemkar, and should have relied upon the assessment of Dr. Edwards in formulating his hypothetical to the VE during the hearing.  The ALJ did include Dr. Edwards' opinions in a hypothetical, and counsel for the plaintiff also posed a hypothetical to the VE that included Dr. Edwards' opinions.  (Tr. 473-475.)  Even if the ALJ had not included Dr. Patikas' findings in his hypothetical to the VE, the VE's responses would not have changed.  In addition, the ALJ did not accept Dr. Patikas' findings.  As addressed above, the ALJ did not accept Dr. Edwards' opinions and it was not error for him to do so.

6.    **Whether the Administrative Record Contains Substantial Evidence to Support the ALJ's Determination That the Plaintiff Is Not Disabled**

The plaintiff's final assertion of error is essentially a rehash of her prior assertions of error that have already been addressed.

---

(Tr. 115.)

## V.  RECOMMENDATION

For the above-stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 10) be DENIED, and that the decision of the ALJ be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the order of the District Judge.  *Thomas v. Arn*, 474 U.S. 140, 206 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge